Good morning, ladies and gentlemen. Our first case for argument, Kristofek v. Village of Orland Hills, Mr. Carlson. May it please the court. Good morning, my name is Keith Carlson. I'm one of the attorneys representing the plaintiff, David Kristofek. The written reason for termination that was given to David Kristofek on the day he was fired by the Village of Orland Hills by its police chief, Thomas Scully, was, quote, you contacted several members of this agency telling them the police chief was a criminal and was going to be indicted. You also accused the Village of being corrupt. He was told that reason when he was terminated. In addition to that, this is not the first time we've been before this court on this case. Kristofek, one, was ruled upon largely based upon public concern grounds with a relatively explicit admonition from this court about whether or not the issue of public concern would be determined solely based on motivation. Undaunted, defendants as well as the trial court did not heed that advice and still found that Mr. Kristofek's speech about public corruption within a police department was not a matter of public concern. Let me ask you a question. Does your position depend on there being enough evidence for the jury to infer that the chief knew he had gone to the FBI when he made the decision to fire him? Or do you think you can win even if the chief didn't know about the FBI? I think we can win either way and there's two reasons for that. One is that there's more than enough evidence for the jury to be able to determine that. Based on timing alone, for instance, could be enough. In addition, there's also the factor that the speech to his coworkers was protected, similar to Rankin, for instance, in which he encourages his coworkers to go to the FBI with him. In fact, Officer Riccobeni, in one of the memos to the chief that was the basis for the chief's determination to fire Officer Kristofek, states in there explicitly that he wanted them to join him in the outcry regarding the ticket fixing issue. So there are two different matters of speech there. It's not just that he went to the FBI. It's that even prior to going to the FBI, he encouraged other people to go to the FBI. And as Judge Flom had written in Belk v. Minocqua, the threat of going to an outside public agency is a matter of public concern and it's protected speech. So no, I don't believe that our case at all rises and falls solely on that issue. But I believe, A, there's more than enough evidence in the record to support that. The chief had knowledge because he took this action within a very short period of time of Officer Kristofek going to the FBI. In addition, there's evidence in the record that Deputy Chief Blaha, who was in the meeting, the termination meeting, testified that Chief Scully specifically asked him, did you go to the FBI, which imputes certainly knowledge that the FBI was in consideration at that point. So I think the matter of causation, as this court has written several times, that the matter of causation just requires that it is a motivating factor. I think we've more than surpassed that threshold. Now the defendants also talk a lot about Kristofek's motive, but is it your position he was reporting a matter of public concern, even if part of the reason that he did it was for himself, his own self-interest? I certainly took this court's admonition last time where they specifically told me that I was giving up too much last time, and that no, motive is not dispositive. That the content of his speech, especially when reporting an integrity issue within a police department, is absolutely of such concern that motive becomes irrelevant. But here, there's more than enough facts to demonstrate that Mr. Kristofek was motivated by more than his own concern for his own liability. And the best example of that is, he went and spoke to the other co-workers who were involved too and said, hey, you guys should probably speak out on this too. Officer Riccobeni's memo to Chief Scully says this has to stop, this can't keep going on, which all indicate a broader concern than Mr. Kristofek's personal concerns that may have been involved as well. All of which are reasonable. If you find out after you go to police training at some other institution that you work for, and it says, hey, virtually the same fact pattern, this constitutes official misconduct, that certainly is an inspiration for most people to take action. And in this case, what did Kristofek do? Nilly nilly as the trial court's opinion seems to indicate, not at all. He went and he spoke to a private attorney, and he spoke to his co-workers, and then he went to the FBI. Those are not haphazardly lodged, unfounded accusations. Which seems to be a theme throughout the trial court's opinion, that seems to be the linchpin of upholding its argument. Which is that the trial court found that Officer Kristofek was reckless in his speech. And to find that he was reckless would have to ignore the police training, which we include in our briefs, the verbatim questions and answers, which are fantastically similar to the facts of this case. You would have to ignore the fact that he went to a private attorney. You would have to ignore the fact that he went to the FBI. And you would have to ignore the fact that at the time that he made this speech, there was an Illinois appellate case with ticket fixing by a police chief, and there was an Illinois Attorney General opinion, already published at that time, saying that behavior like this is criminal behavior. Instead, the defendants, as well as the trial court for whatever reason, chose to invert the burden under this case. And that the burden is on the defendants to prove that it was untrue and recklessly made. And that is not the case in this circumstance. Here, Officer Kristofek, if anything, was cautious in his speech, not reckless. And what he said is largely true. There is no burden that when a whistleblower goes and speaks to the FBI, that they have to secure a federal conviction for it to be protected speech. And that certainly seems to be what the conclusion of the trial court and the thrust of the defendant's argument has become. Mr. Carlson. Yes. Mr. Kristofek attends his training seminar in April. I believe, yes. The event occurs of concern in November of the preceding year. Correct. So we have about a six-month issue. Correct. What if he attended the seminar 24 months after? Would that make a difference? I don't think so. What if he did it four years after? I don't think so. So it's infinite. He could wait six years. Correct. I think that it's still in the public... I just want to understand. Certainly, it's our position... So it has no bearing. No, I think that... When no temporal aspect of it comes into play. What becomes relevant is that, hey, I learned that we've been committing a crime for a while ago. Well, wait a second. This isn't some sophisticated financial crime that's alleged here. This is classic, what one would call bribery, right? Well, I don't think it's bribery. Well, whatever it is. The fixing. What would you say it is? I believe that it's... The facts have now proven that there were a series of politicians who talked to each other. No question. And then they call the police chief and the police chief, without talking to anyone or learning any facts, says, release this person. Get rid of the tickets. Everything is gone. And then he lies in a letter to the clerk and says, oh, these tickets were issued in error. No, Mr. Carlson, I don't want to get into a dispute about what it is. Let's just call it inappropriate conduct. Correct. And I'm saying... That any trained officer would know. Our client testified... We speak about Attorney General's reports and the like. Absolutely. And my client... It's in the ether, right, that this kind of conduct is inappropriate. Yes, but my client did not know that it was a crime. He thought it was wrong, but he didn't believe it was a crime until he had that training. He did not know it was a crime until that time. That's what the record demonstrates. You have to remember, my client is not a full-time police officer. So is that going to be the issue? Knowledge of a specific chargeable offense under the Illinois criminal statute, that would be the kind of knowledge necessary for an officer to feel comfortable in speaking on a matter of public concern. No, I don't believe that's a standard at all. I think it's actually irrelevant. You're largely correct in my initial statement, which is I don't think that the temporal limitation, even if he knew it was wrong, would matter. Because at some point or another, it's still the public interest to know if their public officials are engaged in inappropriate conduct, whether or not it was today or ten years ago. There's still an issue that the public has interest in knowing. And whether or not our police departments are operated with integrity, I don't think you have to look further than the newspaper every day for the past several years to indicate that that's a matter that the public certainly seems to have more than a passing interest in. Now, was he, at the time of the stop, he was still on probation, right? He was part-time and still on probation? The term probation is almost irrelevant when you're dealing with a part-time police officer. Because unlike a full-time police officer, they're not entitled to a termination hearing in front of a board of fire and police commissioners. In this case, I don't believe they were covered by a collective bargaining agreement. So the fact is he was largely an at-will employee, subject to certain limitations, which largely were based on the whim of Chief Scully. How many hours a week did he work? It depended on the chief's scheduling of him. Did he have another job? He did. He worked a second job as a part-time police officer for the village of Lamont, which is where the police... So he has two part-time police jobs. Correct. And that's his career. At the time, that was his career. Shortly after he was terminated from Orland Hills, there was a conversation between Chief Scully and the then-chief of the village of Lamont. And then shortly thereafter, for whatever reason, the village of Lamont chose not to continue to employ my client anymore either. So now he works some other employment after much struggle to find him. In any event, the matter of public concern has largely been, I think, squarely addressed by this court in its first case. And I think that the next issue that was raised and dealt with somewhat at a passing level by the trial court was the matter of whether or not this speech was made as a citizen. And as Garcetti and Lane v. Franks have made clear, broad job classifications, broad job descriptions are not sufficient to try to cast the net of employee speech over a person. And certainly if broad job classifications is not enough, then a job title isn't enough. And the fact that he's a police officer and just calling him that does not mean that he had any responsibility for any of the speech that he gave. None of the speech was commissioned by his employer. Specifically, the testimony without impeachment. This is uncontested agreement. He had no obligation to report crime to the federal government. He had no obligation to investigate his supervisors. He had no obligation to do internal affairs investigations. The record overwhelmingly establishes his job was that he was a traffic enforcement cop and he occasionally backed up full-time police officers when they needed help. This was not a, what you would think of, a trained, regular police officer who was out there conducting investigations and all of that sort of thing. This was largely a traffic cop who was hired to enforce the traffic code. Beyond that, the argument about the Pickering balancing test, I think, for whatever reason, causing great disruption, it almost passes on the offensive. There is no evidence demonstrating there was any interruption of service, of operations, or anything in this case. There was no evidence put on that morale was somehow impacted. Really, the only impact here is the same impact that occurs any place when an employee speaks out. His boss didn't like being called corrupt when he'd done corrupt things. And if that's the standard, then there's never protection. There is no Pickering balancing test when there's no weight on the other side for the employer. Here, as this court has held several times, you have compelling speech about public corruption. And when public corruption is the speech, then there is, they have to show a compelling impact, and there is none. I'll reserve the rest of the time. Okay, thank you, Mr. Carlson. Mr. Rubery? May it please the court, good morning. I represent Thomas Scully. We were here before you nearly two years ago, as you know, and at that point in time, you determined that the complaint should have survived the motion to dismiss that the defendants filed. I can report to you now that while the complaint survived the motion to dismiss process, it did not survive the discovery process. Much of what was represented here two years ago, and just now, was simply untrue. Carol Marshall? Why were the tickets canceled? Tickets were canceled because Chief Scully wanted to preempt and short fuse a possible racial profiling and excessive worth claim. I don't believe that. Well, Judge? Because, look, that would mean there would be no more tickets issued to minority groups, right? Well, Judge, this situation... You could not operate a police office, a police department, if the police say, well, of course, we always quash tickets if the person is a member of a minority and says to us, oh, I think you're engaged in racial profiling, right? Well, that didn't happen here, Judge. It's incomplete. Look, the only reason these tickets were quashed was that she's part of this political group who pat each other on the back. That's not the case, Judge. This is Illinois, right? This is a very corrupt state. Judge, she's not a mayor. And politicians doing favors for each other, covering up stuff. Well, Judge... I mean, your timing is bad to be making this argument after what we've been going through in Chicago with police cover-ups, which has cost, you know, the chief of the police department his job. There was no cover-up here. Mr. Brant... They quashed... I believe they quashed these tickets because she, the person who got the ticket, was part of this political structure. And, you know... She was a bus driver at the time, Judge. Yeah, but what had she been before? Well, she'd been collector, and she quit that job to become the bus driver. Apparently, collector's not exactly behind the totem pole there, Judge. Mr. Bradford called out... You don't think she's part of the political... community of this area? Well, that in itself, Judge, does not raise red flags. Yes, it does. The police do favors for each other, for politicians. Of course, that's a matter of public concern. Well, here, Judge... Suppose they just quashed tickets for people that are fellow politicians. Would you see an impropriety in that? No, you wouldn't. Would you or wouldn't you? Well, I can only point to... You answer my question. I can point to Judge Easterbrook's decision. No, you just answer my question. It depends on the situation specifically. What are you being asked to do or not do? In this particular situation, there were allegations of excessive force and racial profiling. These are business offenses. They don't require jailing. In fact, there is no offense. There is no penalty. You cannot be jailed for driving an unregistered vehicle unless that unregistered vehicle is involved in an accident. That didn't happen here. I would point out, as far as the 1977 case Mr. Carlson talks about, in 1977, nine years before this state enacted mandatory insurance, the mandatory insurance law does not provide for any type of jailing. It's not a jailable offense unless the vehicle is involved in an accident. So they did not have to arrest him. And unlike the 1977 case, Judge, there's no bond requirement in this particular situation. In that 1977 case, you had somebody who was driving a potential stolen vehicle. I don't know what you're talking about. This is the case that he mentioned. Look. As I see the case, it looks like a case in which a traffic ticket is quashed because the person who got the ticket is part of this political group. There was no evidence of that kind. We asked them to produce that evidence. I specifically asked them to identify the favors. Who did what or why? Carol Marshall used to babysit Mr. Bradford's children. I mean, that's how that relationship, that's how far it goes back before any type of political association. So this is a neighbor, a friend, calling a friend asking to do something after their child has been arrested and treated unjustly in her view. And Judge, she was there two days later filing a complaint. And do you think that's proper conduct? Pardon me? Do you think that's proper conduct? I think it's a proper exercise of discretion to file a potential lawsuit. Do you think it's proper conduct for people who have gotten a traffic ticket to try to use their influence, their friendship with politically, with government officials to get the ticket quashed? Do you think that's proper behavior? She did not ask... No, you answer my question. Do you think that's proper behavior? In terms of violating... Would you answer my question? Sure, Judge, I'll answer the question. Suppose I get a traffic ticket. Do you think it would be proper for me to call up... I don't actually know anybody. Suppose I knew someone in the police department. Would you think it would be proper for me to call up and say, oh, I'm Judge Posner, and, you know, I would really be grateful if you quashed this ticket. It's embarrassing for a judge to get a ticket. It costs money, and it takes time. Do you think that's proper behavior? No, I do not. Good. You agree on something. Judge, I would only add that Mrs. Marshall did not ask for that to happen, and Mr. Bradford did not ask for that to happen. So you mentioned that counsel misrepresented certain facts. Well, in the complaint, they said she was the former mayor of a nearby town. She wasn't. In the complaint, they said that Mr. Krusevic right away... Well, what's a trustee? She was a trustee back in 2004 in Rich Township. What does a trustee do? What's the nature of that job? As part of a township government, I would tell you... Pardon? I think it was a township... Do you have some statement of what they're supposed to do, or you just don't know? Based on my experience, Judge, township governments in this area don't do a whole lot. That's not my question. My question is, what is the description of the job of a trustee of a village? If you don't know, you don't know. Of a village. It's the equivalent of an alderman. An alderman. I understand that that was Mr. Krusevic's complaint, but what specific facts did he misrepresent that have to do with the way this whole thing happened? Well, first... Specifically, he said he went to the other officers and said, we should report this to the FBI. Did the record bear that out? His testimony was, he was opposed twice. He was asked, what did you say to him? He said, well, I told him and he also said, if you guys don't do it, you might be part of it too because you were there. That is the sum total of what he testified to. And no mention of the FBI, is that what you're saying? No mention of the FBI. There are some memos that talk about him supposedly having a brother who works with Pat Fitzgerald. That turned out to be true. What he has apparently, and he also pled, and it turned out to be untrue, that Alonzo Marshall, the driver was throwing his clout around the whole time saying, my mother is the mayor of a nearby town. That never happened. He never expressed to W. Chief Blaha any expressions or concerns about the unequal application of the law. Never said that, he admits that. Well, you also suggested his allegations were made at a dispute, right? Well, actually we couldn't find out what the attorney said. We asked him and they took the privilege. They asserted the privilege. Attorney Klein, I asked that, I specifically recall asking that question and having the privilege asserted. So how is that reckless, him going to a lawyer and getting a lawyer's advice? What's reckless, that in itself is not. What's reckless is him basically suggesting that Chief violated the law when he had not. And despite what Mr. Carlson says, he does have a duty to report wrongdoing and he testified as much. He admitted as much in his deposition he has that duty. You think quashing tickets as a favor is not wrongdoing? I do not think, if the quashing is conducted for some illicit reason, yes, I agree. But if it's a situation where you have a compliance offense, there's no jail time and you're being threatened with possible lawsuit to defuse the situation, I don't think that's wrongdoing. Not under the Illinois Official Misconduct Statute. There's no gain or benefit to the Chief. And there's been no evidence of any kind of favor trading of any kind. And they got an affidavit from Mr. Bradford. Mr. Bradford just said, I complained about racial profiling, period. That is the record in the case. Essentially, I don't believe I have the obligation to basically disprove what they said. Okay, well thank you, Mr. McGrath. Thank you, Your Honor. Ms. Vanila Lopez? Good morning. May it please the court. I represent the village of Orland Hills. This court should uphold a summary judgment that was rendered in favor of Orland Hills on the Monell claim. There are two reasons that Chief Scully cannot serve as the predicate for municipal liability. First, he was not the final authority. He was not the what? He was not the final authority. Final. Yes. In order to be the final authority, there can be no higher authority. Pursuant to section 35.019 of the village ordinances, it specifically reads, and it is unambiguous, section D provides that to dismiss an employee who is in their probationary period or at the end of their probationary period, it may be done by the department head with the approval of the village administrator, who at the time was John Daly. And the village administrator was Chief Scully's superior. Thus, there was in fact a higher authority that needed to authorize the termination of Christofek. The termination of what? Of Christofek, Your Honor. Oh. If in fact, you accept Christofek's assertion, then the language in the ordinance that states with approval would be superfluous. And that's simply not the case. Furthermore, there is also a constraint in the ordinance in subsection C of the same section, 35.019, which specifies that during the probationary period, an employee may be terminated if it is determined that their performance is unsatisfactory. And that determination of unsatisfactory performance may be made by a supervisor or a department head, again, with the concurrence of the village administrator. The ordinance here must be followed, and they were. I'd like to point out that Counsel for Christofek failed to answer your question, Your Honor. You asked whether or not he was in a probationary status. Instead, they said it was irrelevant. Quite frankly, it's very relevant that he was in a probationary status. He was hired in September of 2010 and terminated in April of 2011, still within his probationary period. Furthermore, my second point is Chief Scully was not the policymaker for the village of Orland Hills. Chief Scully does not make the policy for termination. He was constrained by these rules, by these personnel rules contained in the ordinances. And as such, he was... He needed approval from the village administrator to fire someone? Correct. Is that what you're saying? Correct. No matter who it is he fires? Well, in this case, that would be true. The ordinances on Section Disciplinary Action Procedure Section 35.089 specifies in Section D.2 no employee shall be discharged by the village except at the direction of the village administrator. Depending on an employment status, they either get terminated by approval of the village... What does the concurrence of the administrator mean? Does that mean the administrator has to pass on every proposed firing? Or can the administrator just say, well, you can fire and say to an underling, well, you can fire people for X, Y, or Z? There would be no delegation of that authority. Pardon? There would be no delegation of that authority, Your Honor. Concurrence only applied when they're determining whether or not the performance itself was unsatisfactory. If we're talking about the section that I talked about, 35.019, the concurrence was not required when it came to the actual termination that one, you needed the outright approval and authority of the village administrator to terminate Christofek. Again, the Board of Trustees is in fact the policymaker for the village of ordinances. They approved and enacted the personnel rules that are contained in the village of ordinances and as such are the policymakers. Chief Scully was not the final policymaking authority and summary judgment should be upheld for the village. Okay. Well, thank you very much, Ms. Quinell-Lopez. So, Mr. Carlson, I will avoid taking my umbrage with Mr. Rewberry calling me untruthful to you and I believe you kind of saw through that. With regard to Manel liability, I think starting off the top because we didn't talk about it. Why don't you, Mr. Carlson, rather than speak about umbrage specifically, That's what I was saying. I'm going to Manel. Okay. Go through those three items that he said in the complaint were inappropriately placed. Get to the facts. Certainly. The facts are that on the night well, it's important because you heard the term business offense several times. In fact, the motorist was arrested for a class A misdemeanor and it was a state traffic ticket not an ordinance violation which when Chief Scully was deposed we went through and he said, well, I pull business tickets all the time or something like that and he pulled in all these examples and I said, well, I'm not sure that that makes it right but that also does not make it a state ticket that should be issued to the Cook County clerk and then handled by the Cook County state's attorney and it certainly is not a class A misdemeanor which is a crime. It is not a business violation and that's only been clear in every brief we filed from the trial court to this court back to the trial court and back to this court again. What about him saying that the other officers should go to the FBI because what counsel said was that there was no evidence that he said  He testified to that in one of his two depositions about that and he said, you know, he was encouraging his co-workers to go to the FBI and Officer Riccobeni in his memo indicates as much that he encouraged him to go to an outside agency or something of that nature which that was part of the basis that Chief Scully relied upon in terminating. So the memo said outside agency not FBI. I don't remember the exact language but I can pull it for you if you like. Mr. Carlson, perhaps you can help me with the record a little bit. As I understand it, on the 15th of November a complaint was filed regarding this arrest? May I answer? Yes. Certainly. Well, I assume a complaint was filed and Chief Scully found that there was as well, and I believe it was Sergeant Gatiss was the name of the investigator, conducted an investigation and found there was no wrongdoing by any of these officers. In addition to that, Chief Scully told the mother of the motorist, who was the one who was politically connected, that the officer, that this would be handled and that there would be discipline issued and there never was discipline issued for this matter. So, Chief Scully said he would assign this to the internal affairs investigator? He assigned it to an investigation sergeant. Do we have anything reflecting what occurred in that? I know for a fact that we talked about it in Chief Scully's deposition, which is attached in the record, and that Chief Scully admitted that there was no finding of any sort of misconduct by the officers in this case and that there was no injuries suffered and it's important to note the motorist himself never complained. Was that wrapped up pretty quickly? I don't believe it took very long. Would Chief Scully's deposition reflect that? I believe less than a month, but yes, I believe that that's included in the record. Okay, well, thank you very much, Mr. Carlson, Mr. Lopez, and Mr. Ruby. We'll move on to our next...